UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| DREAMA MOORE, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No. 5:18-cv-00485-HNJ |
| | ) | |
| DELTA AIRLINES, INC., | ) | |
| | ) | |
| Defendant | ) | |

## **MEMORANDUM OPINION AND ORDER**

This action proceeds before the court on Defendant Delta Airline, Inc.'s Motion

for Summary Judgment. (Doc. 45). Plaintiff Dreama Moore claims defendant Delta

Airlines retaliated against her, and discriminated against her on account of her race and

gender, in violation of Title VII of the Civil Rights Act of 1964, *et seq.*, as amended, and

42 U.S.C. § 1981.

Moore bases her claims upon (1) her receipt of discipline for leaving the worksite;

(2) her receipt of discipline for applying makeup at work; (3) her receipt of a Final

Corrective Action Notice ("FCAN"); and (4) Delta's termination of her employment.

The court concludes Moore abandoned her gender discrimination claims, and race

discrimination claims based upon her discipline for leaving the worksite and applying

makeup at work. Similarly, Moore's retaliation and race discrimination claims based

upon the FCAN are untimely under Title VII. In addition, no reasonable juror could

conclude Delta terminated Moore's employment with retaliatory or discriminatory animus in violation of Title VII or § 1981. However, there exist genuine issues of material fact whether the FCAN issued with retaliatory and discriminatory animus under § 1981.

Therefore, based upon the following discussion the court **GRANTS IN PART and DENIES IN PART** Delta's Motion for Summary Judgment. The court will **GRANT** the Motion as to Moore's Title VII gender discrimination, race discrimination, and retaliation claims based upon her discipline for leaving the worksite and applying makeup at work, and the issuance of the FCAN and her discharge. The court will **DENY** the Motion as to Moore's § 1981 retaliation and race discrimination claims based upon the issuance of the FCAN.

## STANDARD OF REVIEW

Pursuant to the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56(a). The party seeking summary judgment bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

If the movant sustains its burden, a non-moving party demonstrates a genuine issue of material fact by producing evidence by which a reasonable fact-finder could return a verdict in its favor. *Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (citation omitted). The non-movant sustains this burden by demonstrating "that the record in fact contains supporting evidence, sufficient to withstand a directed verdict motion." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993). In the alternative, the non-movant may "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *Id.* at 1116–17; *see also Doe v. Drummond Co.*, 782 F.3d 576, 603–04 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 1168 (2016).

The "court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). "Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151 (citation omitted). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least

to the extent that that evidence comes from disinterested witnesses.'" *Id.* (citation omitted).[1]

Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 322–23. In addition, a movant may prevail

---

[1] Typically, "the mere fact that [a] witness is interested in the result of [a] suit is deemed sufficient to require the credibility of [the witness's] testimony to be submitted to the jury as a question of fact." *Sartor v. Ark. Nat. Gas Corp.*, 321 U.S. 620, 628 (1944) (quoting *Sonnentheil v. Christian Moerlein Brewing Co.*, 172 U.S. 401, 408 (1899)). Nevertheless, the court may consider the uncontradicted and unimpeached testimony of such interested witnesses when "no reasonable point of view" tarnishes its veracity. *Chesapeake & O. Ry. Co. v. Martin*, 283 U.S. 209, 216 (1931); *see also Hibiscus Assocs. Ltd. v. Bd. of Trs. of Policemen & Firemen Ret. Sys. of City of Detroit*, 50 F.3d 908, 921 (11th Cir. 1995) (Judgment as a matter of law is appropriate where the uncontroverted testimony of an interested witness is inherently plausible and corroborated by other evidence.) (citing *Brown v. Ford Motor Co.*, 479 F.2d 521, 523 (5th Cir. 1973)). Such evidence strictly manifests as incontrovertible "by proof or circumstances, directly or inferentially"; indeed, "it is difficult to see why, if inaccurate, [such evidence] readily could not have been" contradicted. *Martin*, 283 U.S. at 216; *see also Quinn v. Sw. Wood Prod., Inc.*, 597 F.2d 1018, 1024 (5th Cir. 1979) ("[I]t has been held that such testimony [of interested witnesses], even by an employee of a party, must be taken as true where it was candid, the witness was not impeached, his credibility was not questioned, and his testimony was not controverted although, if inaccurate, it could readily have been shown to be so.") (citing *Martin*, 283 U.S. 209; *Texas Co. v. Hood*, 161 F.2d 618 (5th Cir.), *cert. denied*, 332 U.S. 829 (1947)); *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 272 (3d Cir. 2007) ("The fact is that in considering a motion for summary judgment the court should believe uncontradicted testimony unless it is inherently implausible[,] even if the testimony is that of an interested witness."); *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002) ("We do not interpret the quoted language so broadly as to require a court to ignore the uncontroverted testimony of company employees."); *Wilcox v. State Farm Mut. Auto. Ins. Co.*, 253 F.3d 1069, 1071 (8th Cir. 2001) (Even [if an employee's] affidavit [could] nominally fall within *Reeves*, "where [the plaintiff] was given a clear opportunity to contradict [the defense] affidavit but did not, it would not be obvious error to include the affidavit's contents in the factual mix relevant to summary judgment.").

on summary judgment by submitting evidence "*negating* [an] opponent's claim," that is, by producing materials disproving an essential element of a non-movant's claim or defense. *Id.* at 323 (emphasis in original).

There exists no issue for trial unless the nonmoving party submits evidence sufficient to merit a jury verdict in its favor; if the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249. The movant merits summary judgment if the governing law on the claims or defenses commands one reasonable conclusion, *id.* at 250, but the court should deny summary judgment if reasonable jurors "could return a verdict for the nonmoving party." *Id.* at 248. That is, a court should preserve a case for trial if there exists "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

## BACKGROUND

The undersigned sets forth the following facts for the summary judgment determination, drawn from the evidence taken in the light most favorable to Moore.

## I. Moore's Early Employment

In 2007, Plaintiff Dreama Moore, an African-American woman, commenced employment for Defendant Delta Airlines Inc. as a "Ready Reserve" customer service agent at the Huntsville International Airport in Alabama. As a "Ready Reserve" customer service agent, Moore worked on a part-time, as-needed basis. In May 2010, Delta promoted Moore to a regular, full-time customer service agent position. Moore

performed the same job duties in both positions: assisted Delta passengers at the ticket counter, baggage service office, and terminal gates.

Relatedly, Delta employed Todd Kruebbe, a Caucasian male, as a regular, full-time customer service agent at its Huntsville station. Bill Johnson worked as a Delta Operations Service Manager at its Huntsville station. Johnson reported to Randy Tiemann, who served as the Huntsville Station Manager. Johnson and Tiemann served as Moore and Kruebbe's immediate supervisors. Tiemann reported to Nancee Franklin, a Field Director for Airport Customer Service ("ACS"), and he worked closely with Matthew Morrison, a Human Resources ("HR") Manager for ACS/Cargo. Franklin reported to Stephanie Baldwin, who was then ACS Director of Operations East, and Morrison reported to Josh Jessup, HR General Manager for ACS/Cargo.

Customer service agents receive job performance feedback – positive and negative – from both supervisors and customers. Supervisors may reward customer service agents for outstanding performance with Delta "honor roll passes" and "spot awards," and customers may compliment an agent's performance via surveys or letters. Contrariwise, supervisors may discipline agents for poor performance, and customers may lodge complaints for unsatisfactory customer service. Supervisors maintain a "one-on-one journal" for each agent, in which they document job performance feedback and other employment-related notes.

To discipline a customer service agent, supervisors follow Delta's tiered disciplinary system. The system comprises a series of increasingly punitive disciplinary

actions:  verbally "coaching" the agent, issuing the agent a Written Corrective Action Notice, issuing the agent a written Final Corrective Action Notice (FCAN), and submitting to Delta officials a recommendation for termination of the agent's employment.  When a supervisor recommends termination, Delta officials must either accept or deny the recommendation.[2]  (Franklin Dep. at 46:18–47:19; Morrison Dep. at 101, ll. 19–23; 104, ll. 13–16).

Johnson and Tiemann disciplined Huntsville customer service agents, including Moore and Kruebbe, under Delta's disciplinary system.  Before 2016, Kruebbe's journal reflects he received coaching three times for failing to use guest names "100% of the time" and once for failing to observe a scheduling change.  (Doc. 49-14 at 4–5).  In addition, his journal depicts Kruebbe arrived to work tardy twice, had a face-to-face discussion regarding safety, and received a customer complaint for rudeness.  *Id.*  Each incident occurred in 2014, except for a tardy arrival on January 1, 2015.  Kruebbe's journal only includes entries during the years 2014 to 2017.

---

[2] The parties dispute whether supervisors must first verbally coach an employee, and then progress the employee through each subsequent disciplinary action, or whether supervisors may issue any disciplinary action based upon the severity of the misconduct.  The court does not deem this dispute material to resolution of the claims at bar, particularly as one may view the relevant adverse actions as evincing progressive discipline.

## II.  Moore's 2007–2015 Job Performance History

Moore's journal includes the following job performance feedback for each year between 2007 and 2015[3]:

- **2007:** received "counseling" for tardiness on two occasions; received one "verbal warning" and "Warning Letter" for tardiness

- **2008:** marked tardy on three occasions; "advised" once for tardiness; received one customer complaint for poor service

- **2009:** marked tardy on nine occasions; received one "Final Warning" letter for tardiness; received two customer compliments and one honor roll pass for excellent service

- **2010:** marked tardy on six occasions; promoted to full-time customer service agent; received four customer compliments and one honor roll pass for excellent service

- **2011:** absent on fourteen occasions;[4] had one "discussion on reliability;" received one "Final Warning" letter for the failure to attend a mandatory training; received seven customer compliments, one spot award, and two honor roll passes for outstanding service

---

[3] The journal notes Moore was "advised"; had "discussions"; and received "counseling," a "verbal warning," "Warning Letter," and "Final Warning" letter.  This nomenclature corresponds to a former disciplinary system that parallels the verbal coachings, Written Corrective Action Notices, and FCANs under Delta's current system.  (Johnson Dep. at 57, l. 5; Morrison Dep. at 71–73).

[4] Eleven of these absences stemmed from pregnancy-related illness.

- **2012:** marked tardy on two occasions; received one customer compliment and one "Spot Award" for excellent service; received one customer complaint for poor service

- **2013:** marked tardy on two occasions; received three customer compliments for excellent service; received one customer complaint for poor service

- **2014:** had a "discussion" regarding the failure to complete a mandatory training

- **2015:** marked tardy on one occasion; called in sick on one occasion

(Doc. 47-7 at 7–35).

### III.  Moore's Early 2016 Job Performance History

According to Moore's journal, Johnson verbally coached Moore regarding several topics in the first half of 2016.  In January 2016, Johnson discussed with Moore an occasion on which she called in sick after her request to use vacation time was denied.  In April 2016, Johnson and Moore discussed her "recent absences," and Johnson advised her that "further [issues] could result in administrative action."  (Doc. 47-7 at 8).  Johnson also instructed Moore to improve her performance related to "teamwork, presence in the [workstation] and breaks, lunches and assistance in the [workstation]."  Additionally, Moore received two customer complaints for rudeness in April 2016.  Johnson coached Moore regarding one complaint, and Tiemann coached her regarding the other.

At some point in May 2016, Moore discussed with Tiemann her concern that Johnson was racially discriminating against her.  (Moore Dep. at 128, ll. 12–19).  According to Moore, she told Tiemann "other people had made the statement" that Johnson engaged in such discrimination.  (Moore Dep. at 128, ll. 15–17).  Johnson testified he never knew of Moore's complaint against him.  (Johnson Dep. at 16, ll. 14–17).

In June 2016, Moore called Franklin with misgivings about Johnson and Tiemann.  (Moore Dep. at 217, ll. 8–10).  Moore expressed her concern that Johnson was discriminating against her, and complained that Tiemann refused her request to

work apart from a coworker with whom she was quarreling, even though Tiemann had granted similar requests in the past. (Moore Dep. at 220, ll. 7–10; 225, ll. 6–17).

Contemporaneously in June 2016, Johnson issued Moore a "Written Coaching" for reliability. Johnson conferred with Tiemann and Morrison before doing so, and Tiemann instructed Johnson to specify the instances of Moore's absences or tardy arrivals and confirm the accuracy thereof. The Written Coaching states Moore was "absent 9 days on 6 occasions and tardy once in the last 12 months." (Doc. 49-2 at 2–3). It also notes Moore received "verbal coachings for reliability issues on . . . 12/05/2015, 1/17/2016, 4/3/2016 and 4/4/2016," and declares, "[t]he Verbal counseling is not having the impact that we had expected on your attendance, as seen by your most recent absence on 5/23/2016." *Id.* Moore refused to sign the Written Coaching.

On July 2, 2016, at approximately 3:30 a.m., Johnson witnessed Moore leaving her shift with her child. Johnson notified Tiemann via email two days later after receiving a forwarded text message from an American Airlines employee stating, "This guy has been at y'alls desk for 42 minutes ringing a buzzer and no one is helping him. He said [Moore] was here last night [July 2] and was rude to him with the baby." (Doc. 47-4 at 177). Johnson later understood from Moore "that her babysitter had to bring the baby to work and drop her off . . . because it was getting so late and the babysitter couldn't babysit any longer. Our flights were late that evening. So she didn't get off as scheduled." (Johnson Dep. at 205, ll. 16–22).

Tiemann asked airport officials "to look at film," which produced images of Moore holding her child behind a baggage or ticket counter on six occasions between April 16, 2016 and July 16, 2016. (Doc. 47-2 at 89–104). Moore testified she permitted her teenage son and his father to idle behind the baggage service counter on more than one occasion. (Moore Dep. 116: 4–23, 117: 1–5).

On July 25, 2016, Morrison and Tiemann convened a conference call with Moore to discuss two customer complaints, Moore exceeding her allotted break times, and "reports that [Moore] was bringing her baby to work and holding the baby at the [baggage] counter while working and assisting customers." (Tiemann Dep. at 210, ll. 8–9). During their conversation, Moore told Morrison and Tiemann that Kruebbe brought his two children to work, and she queried the reasons Tiemann did not reprimand Kruebbe for having his children at work. Tiemann responded, "it's different for you." (Moore Dep. at 119, l. 10).

On August 8, 2016, Moore emailed Tiemann to express disquietude regarding his statement, "it's different for you." She wrote:

> I've tried to talk to you and felt as though I didn't matter when our conversation was over. One recent conversation that you and I had, I mentioned that [a co-worker] said, she thought [Johnson] didn't like me because I was black. Then, when you tell me that it's different for me when I bring my child than when [Kruebbe] brings his children bothers me. . . . I couldn't get an answer as to how it's different . . . . The only difference is that he is a white male and I am a black female. We both have our personal home and childcare issues.

(Doc. 47-4 at 105).

Tiemann forwarded Moore's email to Morrison, who forwarded the email to Jessup. Jessup replied to Morrison, "I wouldn't recommend responding via email, but a sit down discussion that is clearly documented in her journal addressing her concerns would be a good option." (*Id.*) Morrison never asked Johnson whether he disliked Moore because of her race for the following reason:

> [Y]ou got to remember people are human and the last thing I want to do is plant that in somebody's mind that they're going to treat someone either potentially or unintentionally different after knowing that situation. The supervisors work day in and day out with these employees. The last thing I want to do is have my supervisor now, whether he wanted to or not, treating that person differently.

(Morrison Dep. 62, ll. 9–17).

Prior to her August 8, 2016, email to Tiemann, Moore emailed Morrison on three occasions to convey concerns that Johnson and Tiemann treated her unfairly. (Doc. 47-2 at 69; 71; 74). In a reply to one email, Morrison thanked Moore for sharing her concerns and asked her to clarify her misgivings. (Doc. 47-2 at 73–74).

## IV. Moore's FCAN

On August 12, 2016, Tiemann issued Moore a Final Corrective Action Notice ("FCAN"). The FCAN references the July 4, 2016, customer complaint that Moore attended to her child while working, and other occasions when her child was present in the workplace. The FCAN advised this behavior was "not only unprofessional but also unsafe which is unacceptable," and "negatively reflects on the Delta brand, the Delta team, and your ability to focus on customers." (Doc. 49-8 at 2). The FCAN also

referenced Moore's various coachings in 2016, including the June 12, 2016, Written Coaching for reliability.

Tiemann discussed the FCAN with Moore upon issuing it to her, and emailed a summary of their conversation to Franklin and Morrison. Tiemann wrote in his summary: "I then took the time to briefly address her [August 8, 2016] email to me, stating I took it personally and felt it was misrepresenting and she was drawing conclusions. I told her everyone matters equally to me." (Doc. 47-4 at 126). Moore remembers that Tiemann "expressed . . . he was offended that [she] would say anything about him being racist toward [her]." (Moore Dep. at 183, ll. 15–18). Franklin represented that Tiemann was upset by the accusation. (Franklin Dep. at 27–28).

The same day Tiemann issued Moore the FCAN, he discussed with Kruebbe "the time that [Kruebbe] asked and I allowed his children to sit in the break room . . . about 4-5 years ago." (Doc. 47-3 at 19). Tiemann testified that in or around 2011, Kruebbe's ex-spouse unexpectedly brought his children to the workplace during his shift. (Tiemann Dep. at 226, ll. 2–4). According to Tiemann's documentation of their 2016 discussion, Kruebbe's children were present on three to five additional occasions between 2011 and 2014, during which the children sat in the "back office," and other occasions when Kruebbe sat his son in a restaurant area. (Doc. 47-3 at 19). During the 2016 discussion, Tiemann reminded Kruebbe "that we must not allow our children to be in [the] workplace, distracting us from our duties or otherwise interfering with our jobs." (*Id.*) Neither Tiemann nor Johnson disciplined Kruebbe for having his

children at work.  Moore declared she has seen Kruebbe's children "behind the ticket counter."  (Moore Dep. at 120, ll. 14–15).

After Tiemann issued Moore the FCAN, she continued to email Morrison complaints alleging Tiemann treated her differently on the basis of her race.  (Doc. 47-2 at 76–77; 78–80.  She also notified Morrison she believed Tiemann issued her the FCAN in retaliation for her August 8, 2016, email.  (Doc. 47-2 at 79).

## V.    Moore's Termination

After the FCAN, Moore received three customer complaints between August 13, 2016, and August 26, 2016, regarding her assistance at the baggage service counter. First, on August 13, 2016, a customer complained that Moore "was unprofessional and did not possess the basic knowledge of [Delta's] policies" regarding misplaced baggage. (Doc. 47-2 at 63).  In addition, the customer stated "[m]ultiple customers waited at the counter while [Moore] socialized with an acquaintance who was on our flight."[5]  (*Id.*) Next, on August 14, 2016, a customer complained that Moore became "nasty" and "irate" when the customer inquired about misplaced baggage.  (Doc. 47-2 at 64).  The customer added, "[Moore] refused to talk to me or give me any information about my bag.  She was just nasty and so rude."[6]  (*Id.*)  Finally, on August 26, 2016, a customer

---

[5] Moore contends she was speaking with a customer, not socializing with an acquaintance.  (Doc. 47-7 at 16; Moore. Dep. at 192, ll. 1–12).

[6] Moore recalls this customer interaction, but denies she was rude.  (Doc. 47-4 at 15).

complained that Moore "was both rude and unhelpful" at the baggage service counter, and "is not the kind of representative you want handling customers at Delta." (Doc. 47-2 at 65). Tiemann verbally coached Moore regarding each complaint. (Doc. 47-7 at 15–16).

On September 16, 2016, Moore emailed Tiemann to notify him she experienced a troubling interaction with a customer that could provoke a complaint. Tiemann thanked Moore for the alert, yet he did not otherwise respond to her email.

Two days later, Customer DP[7] submitted a complaint regarding the incident via Delta's online customer service portal. According to the complaint, DP approached Moore at the service counter to locate her lost baggage. DP complained:

> As I was telling [Moore] my bag tag number, she showed no concern, was not attentive, and as I was explaining my issue she proceeded to walk away from me mid sentence [sic] to retrieve other abandoned bags left on the carousel as if to say she didn't have time to listen to my issue. . . . As she returns with bag tags stuck to her fingers, she continues to act as if I was not there and begins typing on her computer.
>
> [. . .]
>
> So I proceeded to tell her my bag tag number and she tells me it . . . did not get on the plane to [Huntsville] . . . . So I ask . . . couldn't I arrange for a delivery be made to my home address and she tells me "No we don't deliver." I then say, "Yes, you do because I have had delayed luggage on more than one occasion and Delta has always delivered if I was unable to pickup from the airport."
>
> [. . .]

---

[7] For privacy, the court will only refer to the customer by her initials.

She then gets loud and condescending and says, "IF you would let me FINISH my sentence, I was going to say we won't deliver TONIGHT." So at this point, my patience has run out. . . . I then say "There is absolutely no reason for you to be so rude and act like such an asshole." She then throws the bag tags at me and begins to wave her hands in the air and say "Oh I know you didn't call me out of my name . . . ."

[. . .]

She then . . . refused to help us further. He then tries to ask more about our luggage and she says if we don't leave she will call the police on us. My husband asks her if she was threatening to call the police on us and she responded by actually calling the airport police on both of us.

[. . .]

The police arrive. . . . One officer gets my luggage tag number and proceeds to the counter to try to get information about our luggage and [Moore] refused to even give the police officer the information . . . . The police . . . looked at us and said "This happens frequently with this particular agent."

[. . .]

I have never been so publicly humiliated, angry, and mistreated in my life. YOUR agent was extremely rude, unprofessional, ill mannered, and it was completely uncalled for. . . . I will be switching airlines permanently. I refuse to travel with a company that has such terrible customer service. . . . Also, I work for a corporation which employs roughly 900,000 employees throughout the company and I will make sure to send out a mass email describing my experience so my fellow travelers will be made aware. I will also make sure to post my experience to every social media outlet available to me so that other weekly travelers, such as myself, can be made aware of the type of characters you employ at Delta.

(Doc. 49-11 at 2–3).

Approximately one month later on October 17, 2016, a Delta official forwarded the complaint to Moore's supervisors and asked one of them to contact DP. Tiemann spoke with DP's husband, JP, later that day to discuss the incident. Morrison emailed Tiemann the following day instructing him to investigate the circumstances surrounding the DP complaint. Morrison directed Tiemann to discuss the incident with Moore in detail, and listed specific questions Tiemann should ask Moore during their discussion. Morrison further instructed Tiemann to obtain video footage of the incident and contact the responding police officers.

On October 24, 2016, Moore provided Tiemann her account of the DP incident, which he recorded in Moore's journal. (Doc. 47-4 at 16–17). According to Moore, when she traced the bag tag number DP initially provided, the system portrayed the bag had arrived at the Huntsville airport. Accordingly, Moore walked to the bag carousel to look for the bag. Moore denied she did so while DP was speaking mid-sentence. When Moore did not find the bag, JP provided a different bag tag number for Moore to trace. The system demonstrated that bag failed to arrive in Huntsville, and when Moore told DP that Delta could not deliver the bag that evening, DP started yelling and cursing at Moore. Moore denied she threw the bag tags after DP cursed at her, but confirmed she refused to provide any further assistance. According to Moore, she called the police when DP continued to curse her. Tiemann recorded Moore's version of the events in her journal, and emailed Franklin and Morrison a copy of the entry.

On October 26, 2016, Franklin emailed Baldwin a copy of the DP complaint, Tiemann's record of the discussion with Moore about the complaint, and a summary of Moore's disciplinary history. Baldwin requested this information in advance of a meeting with Moore. Referencing the DP complaint, Franklin wrote, "This should be the trigger for RFT and I am sure that is why she wants to talk to you." (Doc. 47-4 at 147). Baldwin responded, "Let's move forward…this is unbelievable. I will call her later today but good grief." (*Id.*)

The next day, Morrison emailed Tiemann, "Are we done investigating the [DP complaint]? Do we feel it should warrant a coaching or something more?" Tiemann responded, "I am waiting to review video. . . . I think we've exhausted the coaching and more is appropriate." (Doc. 47-4 at 141).

In addition, Baldwin emailed Jessup on October 27, 2016, in reference to Moore: "We have a discrimination claim coming at us regarding [Huntsville] – specifically [Tiemann] and [Johnson]. I'm not convinced there's merit to it but a lot of good buzz words used. The agent implicates Nancee [Franklin] and Matt [Morrison] as knowing about it and not doing anything. . . . Love my job!" (Doc. 47-4 at 146) (ellipsis in original).

The next day, Tiemann emailed Franklin and Morrison to report that he viewed the footage of the DP interaction. (Doc. 49-10 at 2).[8] He reported in the email that

---

[8] The footage lacks audio.

Moore did not throw the bag tags at DP, wave her hands in the air, or walk away from DP mid-sentence, and he noted other aspects of the incident:

> Dreama did not throw the bag tags or waive her hands in the air. She did abruptly set the claim checks back on the counter at the point she refused to help them and was motioning with her hands throughout the conversation. Dreama did initially walk away from the customer, not necessarily in mid-sentence, to retrieve bags from the belt. This took two trips to the belt while customers were waiting for assistance. Rather than quickly and efficiently assist the customers, Dreama pulled bags from the belt and brought them over behind the desk, pulled tabs from the bags and began researching them in the computer. She also made a phone call, talked on the radio and basically ignored [DP and JP] who were standing right in front of her. [DP and JP] were first in line and it appears to take some 7-8 minutes for her to finally start working on their claim. At least 3 other customers were waiting for assistance, as well. I believe this delay in assisting the customers was as the root of the customer's frustration and was completely avoidable had she simply done her job.

(Doc. 49-10 at 2).

Tiemann emailed Franklin and Morrison on November 2, 2016, regarding his conversation with the officers who responded to Moore's call about DP and JP, particularly regarding DP's statement that one of the officers remarked, "this happens frequently with this agent." (Doc. 49-10 at 2). The officer responded to Tiemann, "yes, this happens sometimes." (*Id.*)

Meanwhile, on November 5, 2016, Baldwin engaged in an email exchange with Moore. (Doc. 47-4 at 147). In the email exchange, Baldwin discussed the report she received about Moore's children at work, and contrasted the report with Kruebbe's circumstances:

The issue you raised about another agent's child being at work was a bit different than how you portrayed as an example. You were actually caring for your child at work. The other agent's child was visiting at work and did not stay as I understand from multiple conversations. There is quite a difference as there is when children come to the airport prior to flying. As Matt told you, there is a difference and he is indeed correct. It is NEVER appropriate to have your child at work where you are providing care for them.

(Doc. 47-2 at 86). Moore responded as follows: Kruebbe's children were not just visiting; everyone understood his children were present for the same reason as hers; and Kruebbe informed her that Tiemann approved the presence of Kruebbe's children "because [Kruebbe] had personal issues going on." (*Id.*)

During the same November 5th email exchange, Baldwin informed Moore: "We will be discussing all of this with you more, including your latest customer complaint you told me about. We have watched the video and will be discussing it with you because it's important you understand why we are so concerned." (Doc. 47-2 at 86–87).

On November 6, 2016, Baldwin emailed Tiemann: "As I'm sure you are aware, [Moore] has brought some issues to my attention. I need to hear from you for myself the following . . . ." (Doc. 47-4 at 153). Baldwin then listed specific questions regarding Moore's complaints of unfair treatment. She concluded her email, "I know she is not innocent . . . but at the same time, how we've handled past issues can make a considerable difference in how we handle moving forward and the associated risk." (*Id.*)

On November 7, 2016, Moore, Tiemann, and Morrison met to view video footage of the DP incident. Tiemann summarized the discussion in Moore's journal as follows:

Met with [Moore] and HR M[anager] Matt Morrison to conduct follow-up conversation after further investigation of the [DP] complaint. In an effort to hopefully clarify differences between [Moore's] and [DP's] account of the incident, I acquired the video of the encounter and we viewed it during this meeting. The video (no audio) shows [Moore] walking away from [DP] at the counter, twice, to retrieve other bags from the belt. It did not appear to be in mid-sentence. [Moore] also did not throw the bag tag back at [DP], she set it on the counter in front of her. I advised [Moore] that she clearly walked away from the customer, twice, to retrieve bags off the belt and then started researching them in the computer and making the customers wait longer, which was not a good decision. Other passengers were now waiting, as well. The correct action would've been to engage [DP] in conversation, starting with an apology, and to determine which of her bags was missing. Understandably, this delay in service led to further frustration on the customer's part. I advised [Moore] she still had an opportunity to provide service recovery but instead contributed to further service failures by not promptly taking the claim and not sincerely apologizing for the failure. I reminded [Moore] of our previous, recent conversations about similar complaints and the coaching I provided to resolve these issues satisfactorily. When asked, [Moore] said she did not recall ever apologizing to the customers. She stated she is never rude. [Moore] stated she called the police because she felt threatened and was being cursed at by [DP]. She also said [JP] was starting to get irate. In the video, [DP] had stepped away from the counter to apparently call the PM line, as directed by [Moore], and [JP] appeared calm at all times. [Moore] appeared to be lecturing him, motioning often with her hands. It was at this time she called the police and [JP] calmly walked away from the counter with his other luggage. [Moore] said she called the police for peace sake. I asked [Moore] why she refused the Public Safety Officer's request for her to just take the claim so they could be on their way after everything was de-escalated. [Moore] said [DP] was still cursing at her and being threatening and she was standing her ground. The video never shows any body language of [DP] or [JP] being threatening. I concluded the conversation by advising [Moore] she did not make good decisions and failed to recognize multiple opportunities to

de-escalate and resolve the situation. She instead chose to be confrontational, unhelpful and call the police. I told [Moore] this is not Delta Style service and her behavior is not acceptable. I asked if there was anything else that [Moore] wanted to add to help explain the failed multiple opportunities to provide Delta Style service and take the customer's baggage claim even after the situation had been diffused. No new information was presented . . . .

(Doc. 47-7 at 17–18). At the conclusion of the discussion, Tiemann suspended Moore's employment. Tiemann advised Moore he "would be making a recommendation for a review of her continued employment." (Doc. 47-7 at 18).

On November 9, 2016, Moore sent an email to Baldwin and Morrison in which she commenced with the remark, "I have apologized, as well as stated that looking back at the situation, I could have taken the claim with the cops." (Doc. 47-2 at 88). Moore proceeded to describe DP's negativity and cursing, and Moore declared she herself was not rude. (*Id.*) Moore then recounted her concerns with the adversity and unfair treatment she perceived vis-à-vis the incident. (*Id.*)

On November 10, 2016, Tiemann formally recommended Moore's termination in a memorandum to Franklin. The memorandum opens with a summary of Tiemann's investigation of the DP complaint. In the summary, Tiemann listed his observations from the video footage. Tiemann did not include in the list his observations that Moore did not walk away from DP mid-sentence, wave her hands in the air, or throw the bag tags.

The memorandum proceeds to summarize Moore's disciplinary history, referencing her FCAN, Written Coaching, and various verbal coachings. The

memorandum concludes: "[Moore] has failed to meet Delta's standards and expectations in providing an acceptable level of performance. [Her] poor performance and conduct negatively impacts our team and our customers. As a result, I am recommending her employment be terminated." (Doc. 49-18 at 3). According to Franklin, she reviewed and approved the request for termination, and she sent it to Baldwin for approval before it proceeded to HR. (Franklin Dep. at 46-47).

In a memorandum to Jessup on November 18, 2016, Morrison notes Moore's 2016 discipline notices – the August 12, 2016, FCAN and the June 12, 2016, written coaching regarding attendance. He then summarized ACS's recommendation for termination of Moore's employment. (Doc. 47-6 at 53). Resultingly, Morrison accepted ACS's recommendation for Moore's termination if she refused to resign. Jessup agreed with Morrison, as acknowledged by his signature on the same day. (*Id.*)

In an email exchange with Morrison on November 22, 2016, James Brimberry, Program Manager, Equal Opportunity, remarked that he "had a chance to view the video and the file." (Doc. 47-6 at 54). Morrison confirmed during his deposition that Brimberry reviewed Moore's file because the EEO team always reviews terminations. (Morrison Dep. at 104, 11. 2–16).

On November 28, 2016, Lisa Blackmon, the Manager Director for Human Resources, agreed with Jessup's and Morrison's assessment. (Doc. 47-6 at 53). Subsequently on the same day, Nicole L. Elkins, the Director HR – Equal Opportunity and Compliance, emailed Franklin and Tiemann that the "review of recommendation

for termination of employment for [Moore] [had] been completed and the Company [had] decided to terminate Dreama Moore's employment." (Doc. 49-19 at 2). Tiemann terminated Moore's employment via telephone later that day.

On February 14, 2017, Moore filed a Charge of Discrimination with the Equal Employment Opportunity Commission. (Am. Compl., Ex. A). In her Charge, Moore alleged Delta discriminated against her on the basis of race and sex, and retaliated against her as well. (*Id.*) The EEOC issued a Notice of Right to Sue on December 29, 2017. (Am. Compl., Ex. B). Moore initiated this suit on March 27, 2017. (Doc. 1). In her complaint, Moore alleges the issuance of the FCAN and her termination constitute retaliation, and discrimination on the basis of race and sex in violation of Title VII and 42 U.S.C. § 1981.

**ANALYSIS**

## I. Moore Abandoned Her Title VII Gender Discrimination Claims, and Race Discrimination Claims Based Upon Her Discipline for Leaving the Worksite and Applying Makeup at Work

Moore alleges Tiemann discriminated against her on the basis of sex when he issued her the FCAN, and that Delta did the same when it terminated her employment. The failure of a party to oppose a claim in a pending motion may constitute an abandonment of such claim. *See, e.g., Coal. for the Abolition on Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) (finding that a party's failure to brief and argue an issue before the district court renders the claims abandoned); *Hooper v. City of Montgomery*, 482 F. Supp. 2d 1330, 1334 (M.D. Ala. 2007) (concluding that a plaintiff's failure to respond to claims in a defendant's motion to dismiss resulted in dismissal of those claims as abandoned). As portrayed in Moore's response to Delta's motion, she failed to respond to Delta's arguments against her gender discrimination claim; thus, she neglected to address the merits of Delta's contentions regarding that claim. *See, e.g., Edmondson v. Bd. of Trs. of Univ. of Ala.*, 258 F. App'x. 763, 765 (11th Cir. 2008) (finding that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned") (citing *Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995)). The court thus finds Moore abandoned her gender discrimination claims. Therefore, Delta is entitled to summary judgment on these claims.

In addition, Moore's Amended Complaint alleges Delta reprimanded her for leaving the worksite, whereas it did not discipline a Caucasian female employee for the

same offense. (Am. Compl. ¶ 94). Similarly, the Amended Complaint alleges Delta reprimanded Moore for applying makeup at work, whereas it did not discipline another Caucasian female employee for the offense. (*Id.* ¶ 101). To the extent these allegations form claims for race discrimination, Moore abandoned them by failing to address them in her response to Delta's motion.

Accordingly, the court **GRANTS** Delta's Motion for Summary Judgment on Moore's Title VII gender discrimination claims, and any race discrimination claims based upon her leaving the worksite and applying makeup at work.

## II. Moore's Retaliation and Race Discrimination Claims Based Upon the Issuance of the FCAN are Untimely under Title VII

Moore alleges that Tiemann's issuance of the FCAN constitutes retaliation and race discrimination. Moore advances these claims under both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. However, before a potential plaintiff may sue for retaliation or discrimination under Title VII, she must first exhaust her administrative remedies. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1317 (11th Cir. 2001). That step involves filing a timely charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e-5(b). To be timely within a non-deferral state, such as Alabama, a plaintiff must file her charge within 180 days of the alleged retaliatory act. 42 U.S.C. § 2000e-5(e)(1).

Here, Moore alleges Tiemann retaliated and discriminated against her on the basis of her race when he issued her the FCAN on August 12, 2016. However, Moore

did not file her EEOC charge until February 14, 2017, more than 180 days after Tiemann issued her the FCAN. (Doc. 47-10 at 2). Therefore, Moore did not file her EEOC charge within the 180-day period, and thus, the court finds that she did not timely file an EEOC charge for her Title VII retaliation and discrimination claims regarding the FCAN.

However, in contrast to Title VII claims, § 1981 retaliation and discrimination claims do not contain an administrative exhaustion requirement. *Price v. M&H Valve Co.*, 177 F. App'x. 1, 9 (11th Cir. 2006) (internal citations omitted). Although the 180-day exhaustion rule does not apply, the plaintiff still must timely file a § 1981 claim. Title 28 U.S.C. § 1658(a) created a default limitations period of four years for federal causes of action created after December 1, 1990; a two-year limitations period still applies to certain claims brought under § 1981. *See, e.g., Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 383–84 (2004); *Clark v. APAC Mid-South, Inc.*, 912 F. Supp. 2d 1273, 1281 (N.D. Ala. 2012). Moore's retaliation and discrimination claims fit comfortably within both limitations periods under § 1981, as she filed within two years of August 12, 2016, when Tiemann issued her the FCAN.

Therefore, the court **GRANTS** Delta's Motion for Summary Judgment as to Moore's Title VII retaliation and race discrimination claims based upon the FCAN, and **DISMISSES WITH PREJUDICE** these claims. The court proceeds on Moore's remaining retaliation and discrimination claims.

### III. Moore's Retaliation Claim Based Upon Tiemann's Issuance of the FCAN Proceeds to Trial Pursuant to 42 U.S.C. § 1981; Moore Fails to Sustain a Genuine Dispute of Material Fact as to Her Title VII and § 1981 Retaliation Claims Based Upon Her Termination

Title 42 U.S.C. § 1981 provides, in relevant part, that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as enjoyed by white citizens." 42 U.S.C. § 1981(a). Subsection (b) defines the term "make and enforce contracts" to include, among other things, "the making, performance, modification, and termination of contracts," including employment contracts. 42 U.S.C. § 1981(b). Although § 1981 does not contain an explicit anti-retaliation provision, courts interpret § 1981 to prohibit retaliation based upon an employee's complaints of race discrimination. *See, e.g.*, *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008); *Andrews v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1412–13 (11th Cir. 1998); *Worley v. City of Lilburn*, 408 F. App'x. 248, 250 (11th Cir. 2011) (Section 1981 "prohibits retaliation based on race, even though the statute is silent on that cause of action.") (citing *CBOCS W.*, 553 U.S. 442).

### A. There Exist Genuine Issues of Material Fact Whether Tiemann's Issuance of the FCAN Constitutes Retaliation Pursuant to 42 U.S.C. § 1981

Moore advances a retaliation claim due to Tiemann's issuance of the FCAN, and relies upon circumstantial evidence as proof thereof. As described previously, the FCAN disciplined Moore for caring for her child at work on several occasions – one of which incited a customer complaint – and for other job performance issues. Construing

the evidence in the light most favorable to Moore, a reasonable jury may conclude Moore can establish a *prima facie* case of retaliation. Furthermore, the parties' evidentiary submissions reveal a reasonable juror may conclude Tiemann's issuance of the FCAN constitutes retaliation.

To advance her claim with circumstantial evidence at the summary judgement stage, a plaintiff must rely on a burden-shifting approach akin to the *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), framework. *See Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310-11 (11th Cir. 2016) (citing *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981)). Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case of retaliation, which creates a presumption that the adverse action was the product of an intent to retaliate. *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010). To press a prima facie retaliation claim pursuant to Title VII or § 1981, a plaintiff must demonstrate that (1) she engaged in statutorily protected activity; (2) she suffered a materially adverse action; and (3) some causal relation exists between the two events. *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

To satisfy the first element of the *prima facie* case, Title VII, and by extrapolation § 1981, "recognizes two forms of statutorily protected conduct." *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999). "An employee is protected from discrimination if (1) 'he has opposed any practice made an unlawful employment practice by [§ 2000e]' (the opposition clause) or (2) 'he has made a charge, testified,

assisted, or participated in any manner in an investigation, proceeding, or hearing under [§ 2000e]' (the participation clause)." *Id.* (quoting 42 U.S.C. § 2000e-3(a)).

Moore proceeds under the opposition clause, as Moore challenges alleged, retaliatory conduct stemming from her opposition to perceived discrimination at Delta. Moore must demonstrate "a good faith, reasonable belief that the employer was engaged in unlawful employment practices, which, in the § 1981 context, must be racial discrimination." *Bell v. City of Auburn*, 722 F. App'x 898, 900 (11th Cir. 2018). The burden does not require Moore "to show that the employer actually engaged in an unlawful employment practice." *Berman v. Orkin Exterminating Co.*, 160 F.3d 697, 702 (11th Cir. 1998); *accord Tipton v. Canadian Imperial Bank of Commerce*, 872 F.2d 1491, 1494 (11th Cir. 1989) ("The employee need not prove the underlying claim of discrimination which led to her [complaint]").

As for the first element of the *prima facie* case, the evidence demonstrates that Moore engaged in statutorily protected activity in an email she sent to Tiemann. To recap, on July 25, 2016, Morrison and Tiemann convened a conference call with Moore to discuss, in pertinent respects, "reports that [Moore] was bringing her baby to work and holding the baby at the [baggage] counter while working and assisting customers." (Tiemann Dep. at 210, ll. 8–9). During their conversation, Moore told Morrison and Tiemann that Kruebbe brought his two children to work, and she queried the reasons Tiemann did not reprimand Kruebbe for having his children at work. Tiemann responded, "it's different for you." (Moore Dep. at 119, l. 10). In an August 8, 2016,

email to Tiemann, Moore complained about the discrimination she perceived during the conversation: "[w]hen you tell me that it's different for me when I bring my child than when [Kruebbe] brings his children bothers me. . . . The only difference is that he is a white male and I am a black female." (Doc. 47-4 at 105). Moore's email clearly chronicles her opposition to perceived racial discrimination, thus qualifying as statutorily protected activity.

As for the second element, a materially adverse action manifests if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington*, 548 U.S. at 57. Thus, "[t]he challenged action must be materially adverse from the standpoint of a reasonable employee." *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 978 n.52 (11th Cir. 2008) *abrogated on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Consistent with Supreme Court precedent, the Eleventh Circuit prescribed a "liberal view of what constitutes an adverse employment action" for retaliation claims, pursuant to which an employee must simply demonstrate the employer's conduct "might deter a reasonable employee from pursuing a pending charge of discrimination or making a new one." *Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (citing *Burlington*, 548 U.S at 68).

Assessing this element, a reasonable jury could find that Tiemann's issuance of the FCAN constitutes a materially adverse action. At Delta, an FCAN addresses "serious" job performance issues, and constitutes the most stringent disciplinary action before a recommendation for termination. (Doc. 49-8 at 2). In Moore's circumstances,

the FCAN occasioned a three-year probation for her. Considering the consequential nature of an FCAN and the circumstances that warrant its issuance, a factfinder may conclude a reasonable employee would choose not to lodge a discrimination complaint if he or she would receive an FCAN in return. A reasonable jury, therefore, could conclude the FCAN constitutes a materially adverse action under the second element.

The third element requires Moore to demonstrate a causal connection between the protected activity and the adverse action. At this *prima facie* stage, the Eleventh Circuit construes this causation standard "broadly, requiring only that the protected activity and the negative employment action are not completely unrelated." *Chapter 7 Tr. v. Gate Gourmet, Inc.*, 638 F.3d 1249, 1260 (11th Cir. 2012); *accord Tucker v. Fla. DOT*, 678 F. App'x 893, 896 (11th Cir. 2017) ("[C]lose temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.") (quoting *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006)). Thus, "temporal proximity alone is sufficient to establish an inference of retaliation" if such proximity is "very close." *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1182 (11th Cir. 2010).

As to the third element, a reasonable jury could conclude Tiemann would not have issued Moore the FCAN but for her August 8, 2016, email. The timing of the FCAN, alone, incites this inference, as Tiemann issued Moore the FCAN within four days after she complained via email that he treated her differently from Kruebbe

because of her race.[9]  A reasonable factfinder could conclude this four-day proximity is "very close" under this circuit's causation standard.  *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) (one-month gap between the protected activity and adverse employment action is sufficient to establish a causation).  Therefore, Moore's establishment of a *prima facie* case generates a presumption that Tiemann's issuance of the FCAN resulted from "an intent to retaliate."  *Bryant*, 575 F.3d at 1308.

If the plaintiff establishes a *prima facie* case of retaliation, a burden of production shifts to the employer to proffer a legitimate justification for the materially adverse action.  *Crawford*, 529 F.3d at 976; *Martin v. Brevard Cty. Pub. Sch.*, 543 F.3d 1261, 1268 (11th Cir. 2008).  Delta relies upon several aspects of the record evidence stemming from Moore's job performance to produce a legitimate, non-retaliatory reason for the issuance of the FCAN.

To wit, Moore received verbal coaching regarding customer complaints twice in April 2016.  Johnson issued Moore a Written Coaching on June 12, 2016, to address Moore's "[p]oor reliability."  (Doc. 47-2 at 59–60).  The FCAN prominently cited the occasions when Moore cared for her children at work, including the customer complaint emanating from the July 2, 2016, occasion when the babysitter dropped

---

[9] Tiemann testified that Moore's email "could be considered" a complaint of race discrimination, and "would have the beginnings . . . [o]f a possible complaint about race discrimination."  (Tiemann Dep. at 92, l17; 93, ll. 5–9).  However, Tiemann forwarded Moore's email to Morrison, and testified "that's our standard procedure anytime we get any type of correspondence related to discrimination or things [of] that nature.  We want to immediately engage our HR representatives."  (Tiemann Dep. at 212, ll. 10–14).  Drawing all warranted inferences in Moore's favor, a reasonable jury may conclude Tiemann possessed the requisite knowledge of her racial discrimination complaint for purposes of causation.

Moore's child off at work, as well as occasions when Moore exceeded her allotted break times. (Doc. 49-8 at 2–3). This evidence satisfies Delta's burden of production to elicit a legitimate, justification for the materially adverse action.

If the employer proffers a legitimate justification, the plaintiff sustains a burden of persuasion to demonstrate the proffered legitimate reason was pretext for prohibited retaliatory conduct. *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). The plaintiff can demonstrate pretext by exposing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the defendant's justification. *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007). In addition, "a plaintiff may rely on evidence previously submitted as part of her *prima facie* case" to prove pretext. *Dent v. Ga. Power Co.*, 522 F. App'x 560, 562 (11th Cir. 2013) (citing *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc)).

In conjunction with the foregoing obligation, at the pretext stage a plaintiff must submit sufficient evidence for a reasonable juror to find "her protected activity was a but-for cause of the alleged adverse action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013); *Sims v. MVM, Inc.*, 704 F.3d 1327, 1334 (11th Cir. 2013) (reviewing but-for causation analysis at the pretext stage); *Booth v. Pasco County*, 757 F.3d 1198, 1207 (11th Cir. 2014) (eliciting but-for standard); *see also Scott v. Sarasota Doctors Hosp., Inc.*, 688 F. App'x 878, 884 (11th Cir. 2017) (At the pretext stage, the "plaintiff must also show that the protected activity was a 'but-for' cause of the adverse employment action.") (citing *Nassar*, 570 U.S. at 362); *Mealing v. Ga. Dep't of Juvenile Justice*, 564 F. App'x 421,

427 (11ᵗʰ Cir. 2014) (At the pretext stage, the plaintiff must show her "protected activity was the 'but-for' cause of the adverse action.") (citing *Sims*, 704 F.3d at 1334; *Nassar*, 570 U.S. at 362). "This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Nassar*, 570 U.S. at 360. As elaborated, this standard requires "proof that the [wrongdoer's] conduct did in fact cause the plaintiff's injury." *Id.* at 346.

Thus, but-for causation ensues even "if the predicate act combines with other factors to produce the result, so long as the other factors alone would not have done so – if, so to speak, it was the straw that broke the camel's back." *Burrage v. United States*, 571 U.S. 204, 211 (2014). "This is so because it is natural to say that one event is the outcome or consequence of another when the former would not have occurred but for the latter. It is beside the point that the [adverse action] also resulted from a host of *other* necessary causes . . . ." *Id.* at 212 (emphasis in original). Distilling the foregoing principles, but-for causation requires that the alleged, retaliatory conduct bear "a determinative influence on the employer's adverse decision." *Sims*, 704 F.3d at 1335–36 (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

Pursuant to the foregoing standard and the record evidence, Delta's proffered justification for Moore's FCAN demonstrates pretext based upon inconsistencies and contradictions. Furthermore, a reasonable juror may conclude that an inference of retaliatory animus constitutes the determinative factor for the FCAN, notwithstanding the existence of other necessary causes. That is, the circumstances surrounding the

FCAN permit a reasonable conclusion that Tiemann would not have issued it absent his retaliatory animus toward Moore – even if other causes, such as the misconduct cited in the FCAN, influenced the disciplinary decision. Tiemann's retaliatory animus could reasonably constitute "the straw that broke the camel's back." *Burrage*, 571 U.S. at 211.

First, of course, the close temporal proximity – merely four days – between Moore's complaint of discrimination and the subsequent FCAN evidences a retaliatory animus infused the consideration to issue an FCAN. Other evidence on both assessments – pretext and but-for causation – abounds.

During the discussion Tiemann held with Moore upon issuing her the FCAN, Tiemann addressed her August 8, 2016, email that lodged the complaint of discrimination. Tiemann informed Moore he "was offended that [she] would say anything about him being racist towards [her] . . .", (Moore Dep. at 183, ll. 15–17), and stated to Franklin and Morrison in writing, "I . . . took the time to briefly address her email to me, stating I took it personally and felt it was misrepresenting and she was drawing conclusions." (Doc. 47-4 at 126). Franklin maintained that Tiemann was upset by the accusation. (Franklin Dep. at 27–28). Tiemann's acknowledgement he took Moore's email personally, and the evidence that the accusation upset him, engenders a reasonable inference that Tiemann's alleged retaliatory animus constituted a determinative influence on the issuance of the FCAN.

Buttressing this finding, Morrison testified he would not ask a Delta supervisor if he or she disliked an employee on account of the employee's race, or notify a supervisor of any such charge. To wit, Morrison declined to inform Johnson about Moore's complaint of discrimination against him because "there's an emotional reaction" when a person is charged with harboring racial animus toward another, which incites a possibility "they're going to treat somebody either potentially or unintentionally different after knowing [of the charge] . . . ." (Morrison Dep. at 62, l. 3, 11–13). Read in the light most favorable to Moore, Morrison's testimony conveys he recognized an employee's discrimination complaint could invite adverse consequences – a risk Morrison deemed sufficiently probable to prevent him, a human resources manager, from even discussing a discrimination complaint with a supervisor.

Morrison's understanding, presumably based upon his experience in human resources management, strengthens the inference that Tiemann's reception of Moore's email occasioned an "emotional reaction" that resulted in his issuance of the FCAN. This overlap between Tiemann's reaction to Moore's email and his issuance of the FCAN would allow a reasonable jury to conclude that the two "are not completely unrelated." *Gate Gourmet*, 638 F.3d at 1260. Accordingly, a reasonable jury may conclude Moore can establish the requisite but-for causal connection between her complaint of racial discrimination and the FCAN.

Finally, evidence of pretext and but-for causation manifests in Tiemann's August 12, 2016, discussion with Kruebbe. According to Kruebbe's journal, Tiemann

discussed with Kruebbe the occasion in 2011 when Kruebbe's ex-spouse unexpectedly brought his children to work. This discussion buttresses a finding of pretext.

First, Tiemann held the discussion the same day on which he issued Moore the FCAN, and in reference to the same issue that formed Moore's August 8, 2016, racial discrimination complaint. A reasonable jury could thus infer Tiemann initiated the discussion with Kruebbe to allay any perception he issued Moore the FCAN with retaliatory animus. Second, Tiemann and Kruebbe's discussion of an incident that occurred five years prior in 2011 engenders a reasonable inference Tiemann undertook the discussion as simply a pretense for discipline, and reasonably displays a guilty conscience as to differential treatment. Accordingly, the evidence portrays a genuine dispute of material fact as to whether the FCAN constituted pretext for retaliation.

Furthermore, a reasonable juror may conclude the conduct by Moore and Kruebbe did not differ substantially, which further incites pretext and a reasonable conclusion that Tiemann would not have issued the FCAN in the absence of a retaliatory intent. According to Tiemann's documentation of his discussion with Kruebbe, Kruebbe's children were present on three to five additional occasions between 2011 and 2014, during which the children sat in the "back office," and there exist other occasions when Kruebbe sat his son in a restaurant area. (Doc. 47-3 at 19). Notwithstanding Delta's representations that the presence of Kruebbe's children did not disrupt the workplace, Tiemann reminded Kruebbe "that we must not allow our children to be in [the] workplace, *distracting us from our duties or otherwise interfering with our*

*jobs.*" *Id.* (emphasis added). In addition, Moore declared she has seen Kruebbe's children "behind the ticket counter." (Moore Dep. at 120, ll. 14–15). Nevertheless, neither Tiemann nor Johnson disciplined Kruebbe for parenting his children at work.

For the foregoing reasons, there exists a genuine dispute of material fact whether Tiemann's alleged retaliation was the but-for cause of Moore's FCAN, and thus, the court **DENIES** Delta's Motion for Summary Judgment on Moore's § 1981 retaliation claim as to the FCAN.

### B. A Reasonable Juror Cannot Conclude that Retaliation is the But-For Cause of Moore's Discharge Pursuant to Title VII and 42 U.S.C. § 1981

Moore contends Delta retaliated against her by terminating her employment, in violation of § 1981 and Title VII.[10] Because Moore relies upon circumstantial evidence for her entreaty, the court analyzes her claim under the *McDonnell Douglas* burden-shifting framework described previously.

Delta does not dispute Moore satisfies the first and second elements of the *prima facie* retaliation standard, as she engaged in protected activity by complaining of racial

---

[10] Title VII's anti-retaliation provision provides:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §2000e-3(a).

discrimination and suffered an adverse action via her termination. Delta challenges Moore's proof of causation under the third element of the *prima facie* case. Moore contends Tiemann recommended her termination in retaliation for her complaints of racial discrimination; to establish causation, she argues that the Airport Customer Service and HR officials who accepted Tiemann's recommendation operated as a "cat's paw" for Tiemann's retaliatory animus. Delta counters that Moore's job performance – her reliability issues and multiple customer complaints – severs any but-for causal connection between her racial discrimination complaints and her termination.

In *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), the Supreme Court endorsed the cat's paw theory by defining the circumstances under which an employer could be liable when the decision-maker has no discriminatory animus, yet is influenced by a subordinate supervisor's action that is the product of such discriminatory animus. The Court held that the employer could be liable only if the subordinate supervisor (1) performs an act motivated by antimilitary animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action. *Staub*, 562 U.S. at 422.

Critically, the *Staub* decision adjudicated a claim under the Uniformed Services Employment and Reemployment Rights Act of 1994 (USERRA).[11] As the Court

---

[11] The USERRA prohibits adverse employment action on the basis of a person's obligation to perform military service where antimilitary animus is a motivating factor in the employer's action. 38 U.S.C. § 4311(a), (c).

explained, the second element of its cat's paw doctrine – the proximate cause assessment – aligns with USERRA's (and Title VII's race discrimination) motivating factor, causation standard. *Staub*, 562 U.S. at 420–21. In elaboration, the Court described the circumstances in which an employer's independent investigation severs the cat's paw, proximate cause (motivating factor) link:

> If an employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

*Id.* at 421.

Crucially, the Eleventh Circuit extended *Staub*'s cat's paw doctrine to ADEA cases (which requires proof of but-for causation), albeit with an important modification of the causation standard. *Sims*, 704 F.3d 1327. Referencing *Gross*, which established but-for causation as the governing standard under the ADEA, the court discerned that "nothing in *Gross* is inconsistent with . . . cat's paw claims under the ADEA." *Sims*, 704 F.3d at 1336. As a result, in the ADEA's but-for causation regime, the cat's paw theory requires evidence that a subordinate supervisor (1) performs an act motivated by the proscribed animus that is intended to cause an adverse employment action,[12] and (2)

---

[12] The Court declined to definitively adopt *Staub*'s agency principles as they relate to scienter, proceeding to assume *arguendo* that the evidence established the subordinate supervisor performed an act motivated by discriminatory animus and intended the particular adverse action. *Sims v. MVM, Inc.*, 704 F.3d 1327, 1336–37 (11ᵗʰ Cir. 2013). Nevertheless, the court's holding turns on the causation inquiry, which also represents the crucial inquiry at bar.

that act is "a 'but-for' cause of, or a determinative influence on," the ultimate employment decision. *Sims*, 704 F.3d at 1337. The plaintiff in *Sims* failed to establish that the supervisor's discriminatory animus was the but-for cause of the plaintiff's termination because of the decisionmaker's "own five-month long [reduction-in-force] evaluations"; his "own independent judgment that [the plaintiff] was at the bottom of the list on performance"; and "the unanimous opinion of all persons consulted (except for [the plaintiff] himself)" that he should be fired. *Sims*, 704 F.3d at 1337.

Although the Eleventh Circuit has not ruled in a published opinion that the cat's paw theory applies to Title VII and § 1981 retaliation claims, the Court's holding in *Sims* that the theory applies to the ADEA but-for causation regime forecloses any divergence. Significantly, six months after the Eleventh Circuit decided *Sims*, the Supreme Court ruled that "[g]iven the lack of any meaningful textual difference between the text in [Title VII's anti-retaliation provision] and the [ADEA], the proper conclusion . . . , as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 352 (citing *Gross*, 577 U.S. at 176).

The *Sim*'s holding that *Gross* does not preclude application of the cat's paw theory in ADEA claims, and the Supreme Court's subsequent extension of *Gross* in *Nassar*, demonstrates that a plaintiff may pursue a cat's paw theory of causation in Title VII retaliation cases. Other circuit courts of appeal have reached this same conclusion. *See Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272–73 & n. 4 (2d Cir. 2016) ("the

'cat's paw' theory may be used to support recovery for claims of retaliation [under the but-for causation regime] in violation of Title VII"); *Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015) ("Read together, *Nassar* and *Staub* . . . make clear that cat's paw analysis remains viable in the but-for causation context."); *EEOC v. New Breed Logistics*, 783 F.3d 1057, 1070 (6th Cir. 2015) ("Cat's paw liability will only lie in the retaliation context if the claimant can show that the non-decisionmaker's retaliatory actions were a but-for cause of the decisionmaker's decision to take adverse action); *see also Jones v. City of Heflin*, 207 F. Supp. 3d 1255, 1276 (N.D. Ala. 2016) ("[A] plaintiff is not precluded from invoking the cat's paw theory under but-for causation cases within the Eleventh Circuit even though the determinative influence standard is a more demanding one to prove.") (citing *Sims*, 704 F.3d 1327).[13]

---

[13] To be sure, authority, including Eleventh Circuit decisions, suggests the contrary. *See Duncan v. Alabama*, 734 F. App'x 637, 640 (11th Cir. 2018) ("In the context of the Age Discrimination in Employment Act, we have indicated that, while the cat's paw theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor, . . . the theory is inappropriate when the statute requires but-for causation.") (citing *Sims*, 704 F.3d at 1335–36); *Reynolds v. Winn-Dixie Raleigh Inc.*, 620 F. App'x 785, 792 (11th Cir. 2015) ("[W]hile the [cat's paw] theory may be appropriate in cases in which the plaintiff is required to prove only that the protected characteristic was a motivating factor, . . . the theory is inappropriate when the statute requires 'but-for' causation.") (citing *Sims*, 704 F.3d at 1335–36); *Tonkyro v. Sec'y, V.A.*, No. 8:16-cv-2419-T-36AEP, 2018 U.S. Dist. LEXIS 190519, at *46–47 (M.D. Fla. Nov. 7, 2018) (cat's paw theory does not apply to plaintiff's Title VII retaliation claim) (citing *Duncan*, 734 F. App'x at 640); *Beyer v. Miami-Dade County*, No. 11-24285-CIV-MARTINEZ-GOODMAN, 2019 U.S. Dist. LEXIS 23588, at *95 (S.D. Fla. Feb. 12, 2019) (same).

However, *Duncan* and *Reynolds* constitute unpublished opinions that do not have precedential value, and the *Sims* decision's rationale as to the applicability of the cat's paw theory to but-for causation claims holds sway as binding precedent. "[O]nly the Supreme Court or [the Eleventh Circuit] sitting en banc can judicially overrule a prior panel decision." *Cargill v. Turpin*, 120 F.3d 1366 (11th Cir. 1997) (quoting *United States v. Woodard*, 938 F.2d 1255, 1258 (11th Cir. 1991), *cert. denied*, 502 U.S. 1109 (1992)).

Therefore, the court will analyze Moore's retaliation claim via the cat's paw theory of causation she advances, and assess whether a reasonable jury may conclude that (1) Tiemann, motivated by retaliatory animus, intended to cause Moore's termination, and (2) Tiemann's act is "a 'but-for' cause of, or a determinative influence on," the ultimate employment decision.

As to the first element of the standard, the foregoing assessment of the FCAN retaliation claim demonstrates a reasonable juror may conclude Tiemann harbored retaliatory animus when he recommended Moore's termination. To recount, Tiemann's recommendation of Moore's discharge stemmed from the DP customer complaint. Nevertheless, like the supervisor in *Smith v. Library Board of Homewood*, No. 2:15-cv-02094-MHH, 2018 WL 2011026, at *3 (N.D. Ala. Apr. 30, 2018), who told the plaintiff she "could hold a grudge" regarding the plaintiff's charge of bias, Tiemann took Moore's discrimination complaint against him personally. Furthermore, Morrison conveyed concern that a supervisor may treat an employee differently after such employee lodges an allegation of racial discrimination against said supervisor. The evidence of Tiemann's personal animus occurred less than three months before Tiemann recommended Moore's discharge, and Moore pursued her complaints of discrimination up to her discharge.

Moreover, the manner in which Tiemann depicted the DP complaint in his recommendation raises the possibility of retaliatory animus. Prior to submitting his formal recommendation letter to Franklin, Tiemann confirmed, contrary to the

allegations in the DP complaint, that Moore did not wave her hands in the air, throw the bag tags at DP, or walk away from DP mid-sentence. Tiemann's recommendation, however, does not contain these observations. Tiemann acknowledged "the very different accounts of the situation by [DP] and CSA Moore," but proceeded to list only those allegations which he substantiated to the exclusion of those he rejected.[14]

Delta maintains these rejected allegations are "inconsequential." Yet, as Tiemann's own recommendation suggests, Moore contested DP's account of their interaction and maintained she was justified in her handling of the situation. Tiemann's failure to include facts that tend to undermine DP's allegations and diminish the impropriety of Moore's conduct raises an inference Tiemann was "simply waiting for an opportunity to retaliate under circumstances that would provide cover for [his] decision." *Smith*, 2018 WL 2011026, at *14. A reasonable jury, therefore, could determine Tiemann harbored retaliatory animus when he recommended Moore's termination.

However, Moore fails to demonstrate a reasonable juror could conclude that Tiemann's alleged retaliatory recommendation constituted the but-for cause of Delta's ultimate decision to terminate her employment. To prevail on her cat's paw theory at this summary judgment stage, Moore must present evidence from which a reasonable

---

[14] The court notes Tiemann relayed in a prior email to Franklin and Morrison that Moore did not wave her hands in the air, throw the bag tags, or walk away from DP mid-sentence. Thus, Tiemann did not withhold this information altogether. Tiemann's prior email, however, does not neutralize the inference flowing from his selective exclusion of the information in his formal recommendation.

jury could infer that Tiemann's alleged retaliatory act bore a determinative influence on, and thus constituted the but-for cause of, Delta's decision to discharge Moore. *Sims*, 704 F.3d at 1336–35. No reasonable jury could conclude Moore's termination would not have occurred in the absence of Tiemann's recommendation; that is, Tiemann's recommendation did not constitute the determinative factor in Moore's discharge.

The record in this case contains substantial evidence that Delta's decisionmakers, ACS and HR, ultimately discharged Moore based upon her job performance, not because of Tiemann's necessary,[15] but not dispositive, recommendation. Tiemann's initial recommendation for Moore's termination progressed through multiple channels before Delta ultimately accepted it: Tiemann recommended Moore's termination in a memorandum to Franklin on November 10, 2016. Franklin accepted the recommendation, next obtained Baldwin's approval of the recommendation,[16] and then

---

[15] Tiemann's recommendation constitutes only a necessary cause of Moore's termination because, as elaborated in the following discussion, the evidence portrays that Delta discharged Moore *because of its judgment* that Moore's job performance warranted such action. Thus, "[i]t is beside the point that [her termination] also resulted from" Tiemann's initial recommendation. *Burrage*, 571 U.S. at 212.

[16] In a December 20, 2018, response to Moore's interrogatories, Delta did not name Baldwin among the officials it identified as participating in the decision to terminate Moore's employment. Delta's response, however, predated Franklin's April 5, 2019, deposition testimony that Baldwin approved Tiemann's recommendation before Franklin escalated it to HR. Federal Rule of Civil Procedure 26(e)(1)(A) provides a party must supplement or correct an interrogatory response "if the party learns that in some material respect the . . . response is incomplete or incorrect, and *if the additional or corrective information has not otherwise been made known to the other parties during the discovery process.*" Fed. R. Civ. P. 26(e)(1)(A) (emphasis added). Pursuant to this rule, Franklin's deposition testimony sufficiently informed Moore that Baldwin participated in the termination decision by effectively amending a prior discovery response. *See id.*; *Jackson v. Sara Lee Bakery Grp.*, No. 2:07-CV-1238-PWG, 2009 U.S. Dist. LEXIS 131725, at *4–5 (N.D. Ala. Dec. 16, 2009) (timing and content of witnesses' depositions furnished the opposing party with knowledge of certain testimony in satisfaction of Rule 26(e)(1)(A)).

Franklin, on behalf of ACS, submitted the recommendation to HR. On November 18, 2016, Morrison adopted ACS's recommendation and escalated it to HR General Manager Jessup. Jessup and another HR Managing Director, Lisa Blackmon, approved the recommendation for termination. On November 28, 2016, another Delta HR official, Nicole Elkins, notified Franklin and Tiemann that "the Company . . . decided to terminate Dreama Moore's employment." (Doc. 49-19 at 2).

Those Delta officials reviewed Tiemann's recommendation to reach their decisions, which incorporates by reference Moore's Written Coaching, FCAN, and, most crucially, customer complaints during 2016. In addition to the DP complaint, the pertinent customer complaints include six that occurred between April and August 2016. In April 2016, a customer complained that Moore was "indifferent and rude" at the baggage service counter, while another complained that she delayed providing assistance to apply makeup and answer a phone call. (Doc. 47-4 at 169). On July 2, 2016, a customer complained that Moore behaved rudely while holding her child behind a service counter. (Doc. 47-4 at 177). In August 2016, a customer complained that Moore was "unprofessional" and delayed providing assistance to "socialize with an acquaintance." (Doc. 47-2 at 63). The same month, a second customer complained that Moore became "nasty", "irate", and "so rude" when the customer inquired about misplaced baggage. (Doc. 47-2 at 64). Finally, a third customer complained in August

---

Moore maintains in her summary judgment opposition that Baldwin participated in the discharge decision. (Doc. 48 at 33).

2016 that Moore "was both rude and unhelpful" at the baggage service counter. (Doc. 47-2 at 65).

Notably, Morrison initiated and managed Tiemann's investigation of the DP complaint and exercised his independent judgement therein before Tiemann recommended Moore's termination. Although Tiemann performed each major step in the investigation, he did so at Morrison's direction and with Morrison's guidance. In an initial email regarding the complaint, Morrison wrote to Tiemann, "[t]his behavior is extremely concerning and is not the first complaint regarding rude behavior in the recent past." (Doc. 47-4 at 144). The latter allusion refers to Morrison's review of the customer complaints about Moore on August 13, 14, and 26, all of which negatively assessed Moore's demeanor in customer interactions on the heels of the FCAN, which noted three other customer complaints against Moore.

Back to the DP complaint, Morrison alerted Tiemann they "need to understand what happened from beginning to end from [Moore's] perspective," and provided Tiemann a list of interview questions for Moore to elicit details regarding the incident. (*Id.*) In addition, Morrison directed Tiemann to obtain footage of the incident and speak to the responding security officers. Morrison's email not only demonstrates he controlled the investigation, but also, significantly, that he deemed the incident serious before he received and approved Tiemann's recommendation for her termination.

Furthermore, although Tiemann arguably alluded to Moore's termination when he suggested to Morrison that "we've exhausted the coaching and more is appropriate,"

the investigation did not end there. (Doc. 47-4 at 141). Morrison proceeded to view the DP interaction footage himself and discuss with Moore her account of the interaction. Thus, again, Morrison participated in the investigation personally as part of his management thereof. Accordingly, Morrison reviewed the complaint not only before he approved Tiemann's formal recommendation, but after the first inkling of Moore's termination arose.[17] Therefore, a reasonable juror could not conclude that Morrison's agreement with Tiemann's recommendation represented a mere rubber stamp of Tiemann's predilections.

Similarly, the evidence portrays Baldwin of ACS maintained an independent – and negative – perception of the DP complaint before Tiemann submitted his formal recommendation. Nearly three weeks before Tiemann sent Franklin his formal recommendation letter, Baldwin reviewed an email Franklin sent containing the DP complaint, Tiemann's summary of his discussion with Moore regarding the complaint, and highlights from Moore's recent disciplinary history. Referencing the DP complaint, Franklin wrote, "This should be the trigger for RFT and I am sure that is why she wants

---

[17] In addition, Tiemann emailed Franklin and Morrison on November 2, 2016, regarding his conversation with the officers who responded to Moore's call about DP and JP, particularly regarding DP's statement that one of the officers remarked, "this happens frequently with this agent." (Doc. 49-10 at 2). The officer responded to Tiemann, "yes, this happens sometimes." (Doc. 49-10 at 2). This evidence buttresses the complaints about Moore's customer interactions, especially regarding Morrison's investigation of such complaints. Of course, there exists no viable hearsay objection to both levels of Tiemann's report from the officer, as they depict the effect upon the listeners, Morrison and Franklin, not the truth of the matters asserted. *See* Fed. R. Evid. 801(c)(2) ("'Hearsay' means a statement that . . . a party offers in evidence to prove the truth of the matter asserted in the statement."); *United States v. Rivera*, 780 F.3d 1084, 1092 (11th Cir. 2015) (party's "[o]ut-of-court declarations . . . offered only to show their effect on the listener" did not constitute hearsay).

to talk to you." (Doc. 47-4 at 147). Baldwin notably expressed, "Let's move forward…this is unbelievable. I will call her later today but good grief." (*Id.*)

Subsequently, during a November 5, 2016, email exchange, Baldwin informed Moore: "We will be discussing all of this with you more, including your latest customer complaint you told me about. We have watched the video and will be discussing it with you because it's important you understand why we are so concerned." (Doc. 47-2 at 86–87). This communication establishes Baldwin independently investigated the DP complaint with Moore, including by reviewing the video of Moore's interaction with DP.

On the heels of this exchange – that is, November 9, 2016, a day after Moore's suspension but the day before Tiemann's recommendation for termination – Moore sent an email to Baldwin and Morrison in which she remarks, "I have apologized, as well as stated that looking back at the situation, I could have taken the claim with the cops." (Doc. 47-2 at 88). Although Moore proceeds to describe DP's negativity and cursing, declares she was not rude, and proceeds to recount her concerns with the adversity and unfair treatment she perceives vis-à-vis the incident, (*id.*), she nonetheless accepted some blame for the interaction with the customer. Based upon the foregoing review, the evidence unequivocally establishes Baldwin expressed concern about the DP complaint and the status of Moore's employment prior to and independent of Tiemann's recommendation.

As further evidence of an investigation independent, James Brimberry, Program Manager, Equal Opportunity, remarked in an email exchange with Morrison on November 22, 2016, that he "had a chance to view the video and the file." (Doc. 47-6 at 54). Morrison confirmed during his deposition that Brimberry reviewed Moore's file because the EEO team always reviews terminations. (Morrison Dep. at 104, ll. 2–16).

Nevertheless, Moore contends Baldwin herself harbored retaliatory animus, as Baldwin's communication with Jessup "allows a reasonable jury to infer that at the same time [Delta] was considering termination, corporate management viewed [Moore] as a liability to be gotten rid of." (Doc. 48 at 24). The pertinent email remarks: "We have a discrimination claim coming at us regarding [Huntsville] – specifically [Tiemann] and [Johnson]. I'm not convinced there's merit to it but a lot of good buzz words used. The agent implicates Nancee [Franklin] and Matt [Morrison] as knowing about it and not doing anything. . . . Love my job!" (Doc. 47-4 at 146) (ellipsis in original). Although Baldwin composed this email the same day Tiemann suggested "more is appropriate," this email, even read in the light most favorable to Moore, does not permit a reasonable inference Baldwin approved Moore's termination because she constituted a "liability."

Baldwin's remarks, including, "I love my job!," do not reasonably convey an inference that Delta planned to discharge Moore in response to a putative discrimination charge. Indeed, the ostensibly offending phrase – immediately preceded by an ellipsis – more reasonably conveys consternation that Franklin and Morrison allegedly did not investigate Moore's complaints of discrimination. *See* NAVEED SALEH,

THE WRITER'S GUIDE TO SELF-EDITING 137 (2019) ("[E]llipsis points can convey emotion, confusion, hesitation, anxiety, insecurity, suspense, or so forth."). In any event, Baldwin's email does not reasonably convey she herself harbored retaliatory animus.

The same conclusion arises regarding a subsequent email from Baldwin to Tiemann in which Baldwin wrote, "As I'm sure you're aware, [Moore] has brought some issues to my attention. I need to hear from you for myself the following: . . ." (Doc. 47-4 at 153). Then, Baldwin listed specific questions regarding Moore's complaints of racial discrimination, and concluded her email as follows: "how we've handled past issues can make a considerable difference in how we handle moving forward and the associated risk." Baldwin's reference to "moving forward and the associated risk" could reasonably allude to concern about Moore's discrimination complaints and prior responses to them (especially given the allegation recorded in the prior email that Franklin and Morrison ignored Moore's complaints), yet no reasonable juror could maintain such verbiage reflects Baldwin promoted or otherwise desired Moore's discharge *because of* Moore's discrimination complaints. That is, considering all of Baldwin's emails together, none of Baldwin's remarks reasonably reflect a retaliatory animus on her part.

Accordingly, while there exists a genuine dispute of material fact as to Tiemann's alleged retaliatory animus in recommending Moore's termination, Moore cannot establish a but-for link between the allegedly biased recommendation for her

termination and Delta's acceptance thereof via the other officials who reviewed the request for termination. While Tiemann's recommendation served as a necessary cause of Moore's termination, no reasonable juror could conclude his alleged retaliatory motive constituted the but-for cause thereof.

Therefore, the court **GRANTS** Delta's Motion for Summary Judgment on Moore's Title VII and § 1981 retaliation claims based upon her termination. The court will permit Moore's § 1981 retaliation claim based upon the issuance of the FCAN to proceed to trial.

## IV. Moore Sustains Her § 1981 Race Discrimination Claim Based Upon the FCAN, But Not the Race Discrimination Claims as to Her Termination

Title VII provides it is unlawful for a covered employer "to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . race [or] color." 42 U.S.C. § 2000e-2(a)(1). Similarly, section 1981 provides, in relevant part, that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as enjoyed by white citizens." 42 U.S.C. § 1981(a). Subsection (b) defines the term "make and enforce contracts" to include, among other things, "the making, performance, modification, and termination of contracts," including employment contracts. *Id.* § 1981(b). These provisions provide parallel claims for race

discrimination, which courts analyze together under one framework. *Crawford*, 529 F.3d at 970.

Moore alleges that Tiemann's issuance of the FCAN and Delta's termination of her employment each constitute racial discrimination in violation of Title VII and § 1981.[18] Relying upon circumstantial evidence, Moore argues racial discrimination was a "motivating factor" for Tiemann's issuance of the FCAN and Delta's termination of her employment. (Doc. 48 at 28). To evaluate her mixed-motive theory of discrimination, Moore argues, the court need not assess her claims pursuant to the *McDonell Douglas* framework, but rather discern only whether the evidence would permit a reasonable jury to conclude her race was a motivating factor for the FCAN and her termination. Moore argues, alternatively, that her claims survive the *McDonell Douglas* framework.

Title VII and § 1981 race discrimination claims typically rise and fall together, as the Eleventh Circuit has consistently declared the statutes "have the same requirements of proof and use the same analytical framework." *Chapter 7 Tr.*, 683 F.3d at 1256–57 (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11ᵗʰ Cir. 1998)). Plaintiffs may pursue such claims through either a single-motive or mixed-motive theory, based upon either direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90,

---

[18]As previously discussed, Moore's Title VII discrimination claim based upon the FCAN fails for untimeliness. Therefore, the court considers Moore's allegations of discrimination vis-à-vis the FCAN under § 1981 only.

99–102 (2003). Regardless of the theory presented, "the plaintiff bears 'the ultimate burden of proving discriminatory treatment by a preponderance of the evidence.'" *Crawford*, 529 F.3d at 975 (quoting *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990). However, whether a plaintiff advances a single-motive or mixed-motive theory affects her burden at the summary judgment stage and the court's evaluation thereof.

The *McDonnell Douglas* burden-shifting scheme initially emerged as the primary analytical framework at the summary judgment stage for Title VII and § 1981 discrimination claims founded upon circumstantial evidence. *See Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 922 (11th Cir. 2018); *Wilson v. B/E Aero, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004). In *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016), the Eleventh Circuit upheld a different analytical framework for mixed-motive discrimination claims founded on circumstantial evidence. The Court reasoned that the *McDonell Douglas* framework contemplates the existence of a single reason – or motive – for an employer's adverse employment action, and thus "is fatally inconsistent with the mixed-motive theory of discrimination." *Id.* at 1237. Adopting the framework announced in *White v. Baxter Healthcare Corp.*, 533 F.3d 381 (6th Cir. 2008), the Court held that where a mixed-motive discrimination claim rests on circumstantial evidence, a plaintiff must offer "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Quigg*, 814

F.3d at 1239 (alteration and emphasis in original) (quoting *White*, 533 F.3d at 400). The court applied the mixed-motive framework to the plaintiff's Title VII and § 1983 claims.

The Eleventh Circuit has applied the mixed-motive theory to § 1981 claims. *See Harrison v. Belk, Inc.*, 748 F. App'x 936, 941–42 (11th Cir. 2018) (assessing a mixed-motives claim under both § 1981 and Title VII); *Vinson v. Koch Foods of Ala., LLC*, 735 F. App'x 978 (11th Cir. 2018) (reversing grant of summary judgment on plaintiff's § 1981 and Title VII mixed-motives claims); *see also Jones v. City of College Park*, 2009 U.S. Dist. LEXIS 131334, at *3–4 (N.D. Ga. July 24, 2009) ("The standard of proof for 42 U.S.C. § 1981 claims is the same as the standard under Title VII. . . . Therefore, under Eleventh Circuit authority, the 'motivating factor' standard of proof is the standard of proof for 42 U.S.C. § 1981 discrimination claims."). Furthermore, the *Quigg* court sanctioned the plaintiff's § 1983 mixed-motive claim, and "[t]he analysis of race discrimination claims . . . under § 1983 . . . utilize the same framework as race discrimination claims under Title VII and § 1981." *Kidd v. Jasper*, No. 6:17-cv-1180-TMP, 2018 WL 2766058, at *9 (N.D. Ala. June 8, 2018); s*ee Braswell v. Allen*, 586 F. Supp. 2d 1297, 1308 (M.D. Ala. 2008) ("Because Plaintiffs' claims are based on the same facts, the Court's discussion of Plaintiff's discrimination claims are the same whether the Court is considering [them] pursuant to Title VII, section 1981, or section 1983.").[19]

---

[19] *But see Shannon v. AMTRAK*, 774 F. App'x 529, 541 n.16 (11th Cir. 2019) ("This Court has not addressed whether *Quigg*'s mixed-motive framework can be applied to race discrimination claims brought under § 1981); *Warren v. Coosa Cty. Bd. of Educ.*, No. 2:17-cv-01977-ACA, 2019 U.S. Dist. LEXIS 187039, at *16, 16 n.5 (N.D. Ala. Oct. 29, 2019) ("[T]o establish his § 1981 race discrimination

Nevertheless, Title VII and § 1981 mixed-motives claims do differ as to the applicable defenses. In the Civil Rights Act of 1991, Congress amended Title VII to provide that an employer may only escape damages – but not all liability – upon proving it would have made the same decision absent consideration of the plaintiff's protected characteristic. Civil Rights Act of 1991, Pub L. No. 102-166, § 107, 105 Stat. 1071, 1075–76 (codified at 42 U.S.C. §§ 2000e-2(m), 2000e-5(g)(2)(B)); s*ee* *Chavez v. Credit Nation Auto Sales, LLC*, 641 F. App'x 883, 888 (11th Cir. 2016) ("After *Price Waterhouse*, Congress passed the Civil Rights Act of 1991, which made the same-decision defense no longer a complete affirmative defense to liability in Title VII discrimination cases . . . .").

As for § 1981, a more pronounced, same decision standard applies. In *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), the Court established that a plaintiff may establish a *prima facie* case of intentional discrimination by demonstrating her protected characteristic constituted a motivating factor for the adverse employment action. *Price*

---

claims, [plaintiff] must satisfy his burden under the *McDonnell Douglas* single-motive or pretext test. . . .To the extent the Eleventh Circuit's 2016 decision in *Quigg* conflicts with its 1999 decision in *Mabra*, this court is bound to follow the earlier decision"); *Collins v. Koch Foods Inc.*, No. 2:18-cv-00211-ACA, 2019 U.S. Dist. LEXIS 161870, at *16 (N.D. Ala. Sept. 23, 2019) ("Title VII expressly permits a plaintiff to establish liability [through a mixed-motive theory]. But 'the mixed-motive amendments [to Title VII] do not apply to § 1981 claims.' Thus, . . . [plaintiff] must satisfy her burden under the *McDonnell Douglas* test.") (alteration in original) (quoting *Mabra*, 176 F.3d at 1357).

Notably, the Supreme Court will address the motivating factor standard applies to § 1981 claims in its review of *National Association of African American-Owned Media v. Comcast Corp.*, 743 F. App'x 106 (9th Cir. 2018), *cert. granted*, 87 U.S.L.W. 3475 (U.S. June 13, 2019) (No. 18-1171).

This dispute bears little significance at this stage of the case, as the court finds additionally that Moore may advance her claim pursuant to a single-motive theory.

*Waterhouse*, 480 U.S. at 250. Yet, an employer may escape liability by establishing it "would have made the same decision even if it had not taken the plaintiff's [protected characteristic] into account." *Id.* at 258. Thus, *Price Waterhouse* initially established a plaintiff's ability to pursue a mixed-motive theory of discrimination under Title VII, on the one hand, and a defendant's ability to mount a complete affirmative defense thereto on the other. As described previously, Title VII no longer permits the latter due to the Civil Rights Act of 1991.

For § 1981, however, the Eleventh Circuit maintains "the [1991] Title VII amendments limiting the impact of a mixed-motive defense do not apply to § 1981 claims." *Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357 (11th Cir. 1999); *see also Quigg*, 814 F.3d at 1242 ("under § 1983 the [same decision] defense serves as a complete bar to liability") (citing *Harris v. Shelby Cty. Bd. of Educ.*, 99 F.3d 1078, 1084 n.5 (11th Cir. 1996)). Therefore, a defendant may assert the *Price Waterhouse* same-decision defense to escape all liability under § 1981 for mixed motive claims. *See Coleman v. Starbucks*, No. 6:14-cv-527-Orl-22TBS, 2015 U.S. Dist. LEXIS 141765, at *30 (M.D. Fla. Aug. 5, 2015) ("The Eleventh Circuit has construed the 1991 Act to have no effect on § 1981 claims, which are governed by the unmodified *Price Waterhouse* framework.") (citing *Mabra*, 176 F.3d at 1358); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 n.5 (3d Cir. 2009) (defendant may assert the *Price Waterhouse* complete same-decision defense to liability under § 1981); *accord Sanghvi v. St. Catherine's Hosp.*, 258 F.3d 570, 575 n.5 (7th Cir. 2001); *Carl v. Fulton County*, No. 1:07-CV-1812-WBH-AJB, 2008

U.S. Dist. LEXIS 127516, at *63–64 (N.D. Ga. Dec. 16, 2008); *Bethel v. Porterfield*, 293 F. Supp. 2d 1307, 1320 n.15 (S.D. Ga. 2003).

Pursuant to the foregoing discussion, the court will analyze both Moore's § 1981 and Title VII race discrimination claims, where applicable, under the *Quigg* mixed-motive framework before addressing her arguments under the *McDonnell Douglas* framework.

### A. Moore Sustains a Genuine Issue of Material Fact under *Quigg* and *McDonnell Douglas* as to Whether Tiemann Discriminated Against Her Under § 1981 in Issuing Her the FCAN

*1. A Reasonable Jury Could Infer Moore's Race Constituted a Motivating Factor for the FCAN Under the* Quigg *Framework.*

To defeat summary judgment, Moore must present sufficient evidence to permit a reasonable jury to conclude the FCAN constitutes an adverse employment action, and her race a motivating factor for the FCAN. *Quigg*, 814 F.3d at 1239. Delta does not dispute the FCAN constitutes an adverse employment action. Accordingly, the court will assess whether there exists evidence from which a reasonable jury could infer Tiemann considered Moore's race in issuing her the FCAN.

Moore argues Tiemann's comment "it's different for you" demonstrates her race was a motivating factor for the FCAN. Tiemann told Moore "it's different for you" during the July 25, 2016, conference call when Moore queried the reasons she, but not Kruebbe, received discipline for having her child at work. When a plaintiff relies upon a supervisor's comment as circumstantial evidence of intentional discrimination, the

court must "read [it] in conjunction with the entire record" to discern its context and meaning. *Ross v. Rhodes Furniture*, 146 F.3d 1286, 1292 (11th Cir. 1998); *cf. Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 456 (2006) ("The speaker's meaning may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."). "The appropriate inquiry is whether the remark[], when taken in conjunction with the entire record, [is] circumstantial evidence of the decision-maker's discriminatory . . . attitude." *Castillo v. Roche Labs, Inc.*, 467 F. App'x 859, 863 (11th Cir. 2012).

A reasonable juror may conclude that Tiemann's remark reflects differential treatment on the basis of race. In particular, a reasonable juror may conclude that Tiemann's differential treatment of Kruebbe in similar circumstances evinces discrimination was a motivating factor in the issuance of Moore's FCAN.

As recounted previously in the section regarding the retaliation claim, on August 12, 2016 – the day Tiemann issued the FCAN to Moore for, among other alleged conduct, her care of her child at work – Tiemann discussed with Kruebbe the occasion in 2011 when Kruebbe's ex-spouse unexpectedly brought his children to work. A reasonable jury could thus infer Tiemann initiated the discussion with Kruebbe to allay any perception he issued Moore the FCAN with a discriminatory animus. Second, Tiemann and Kruebbe's discussion of an incident that occurred five years prior in 2011 engenders a reasonable inference Tiemann undertook the discussion as simply a pretense for discipline, and reasonably displays a guilty conscience as to differential

treatment.  Accordingly, the evidence portrays a genuine issue of disputable fact as to whether the FCAN resulted from discrimination as a motivating factor.

Furthermore, a reasonable juror may conclude the conduct by Moore and Kruebbe did not differ substantially, which further incites a reasonable conclusion that race was a motivating factor in the issuance of the FCAN.  According to Tiemann's documentation of his discussion with Kruebbe, Kruebbe's children were present on three to five additional occasions between 2011 and 2014, during which the children sat in the "back office," and there exists other occasions when Kruebbe sat his son in a restaurant area.  (Doc. 47-3 at 19).  Notwithstanding Delta's representations that the presence of Kruebbe's children did not disrupt the workplace, Tiemann reminded Kruebbe "that we must not allow our children to be in [the] workplace, *distracting us from our duties or otherwise interfering with our jobs*."  *Id.* (emphasis added).  In addition, Moore declared she has seen Kruebbe's children "behind the ticket counter."  (Moore Dep. at 120, ll. 14–15).  Nevertheless, neither Tiemann nor Johnson disciplined Kruebbe for parenting his children at work.

The foregoing recitations demonstrate a reasonable juror may conclude Tiemann erroneously differentiated Kruebbe from Moore.  Coupled with his explanation to Moore that "it's different for you," a reasonable juror may conclude race was a motivating factor in Tiemann's issuance of the FCAN.

Finally, Delta has not sustained its burden that it would have made the same decision notwithstanding the alleged discriminatory motive.  Because Delta bears the

burden of proof on its same decision affirmative defense, its status as the summary-judgment movant requires it to establish there is no genuine dispute of material fact as to all of the elements of its defense and, concomitantly, that it deserves judgment as a matter of law on the defense. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) ("The movant must show . . . on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party.").

As previously discussed, an employer may avoid liability under § 1981 "if it can prove that, even if it had not taken [race] into account, it would have come to the same decision" regarding the plaintiff's employment. *Price Waterhouse*, 490 U.S. at 242; *see also Mabra*, 176 F.3d at 1357–58. In this case, Delta fails to articulate any argument or identify any evidence demonstrating that it would have issued Moore the FCAN in the absence of Tiemann's allegedly discriminatory motive. Delta, in turn, fails to carry its burden of establishing the absence of a genuine dispute of material fact as to the same decision affirmative defense. Accordingly, Delta cannot defeat Moore's race discrimination claim at this summary judgment stage.

> 2. *Moore Sustains an Inference of Discrimination Under the* McDonnell Douglas *Framework.*

Moore also sustains a genuine issue of material fact as to race discrimination under the *McDonell Douglas* framework. Under the *McDonell Douglas* framework, "the plaintiff bears the initial burden of establishing a *prima facie* case by proving, among

other things, that she was treated differently from another 'similarly situated' individual." *Lewis v. City of Union City*, 918 F.3d 1213, 1217 (11th Cir. 2019) (en banc) (citing *Burdine*, 450 U.S. 248, 258–59).

The plaintiff must prove that "she and her comparators are 'similarly situated in all material respects,'" such that "they 'cannot reasonably be distinguished.'" *Id.* at 1224, 1228 (quoting *Young v. UPS*, 125 S. Ct. 1338, 1355 (2015)). To assess whether a plaintiff and her comparators are similarly situated in all material respects, a court may consider whether the comparators (1) "engaged in the same basic conduct (or misconduct) as the plaintiff;" (2) were "subject to the same employment policy, guideline, or rule as the plaintiff;" (3) were "under the same jurisdiction of the same supervisor as the plaintiff;" and (4) "share[d] the plaintiff's employment or disciplinary history." *Id.* at 1227–28. Moore can establish a proper comparator under this framework.

At the outset, the court notes Kruebbe, like Moore, serves as a customer service agent under Tiemann's supervisory jurisdiction and subject to the Delta disciplinary system. Kruebbe and Moore are thus similarly situated with respect to the second and third factors under *Lewis*. As described previously, Moore and Kruebbe engaged in substantially similar conduct.

First, the evidence permits a reasonable inference that Moore and Kruebbe both cared for their children at the workplace under similar circumstances. Photographic and testimonial evidence portrays that Moore held her child while working behind the service counters. (Doc. 47-2, 89–104). Significantly, Moore averred she saw Kruebbe's

children, likewise, "behind the ticket counter." (Moore Dep. at 120, ll. 14–15). Moreover, Kruebbe's journal reflects his children were present in the "back office" on four to six occasions between 2011 and 2014. (Doc. 47-3 at 19).

Furthermore, a reasonable juror may conclude that Kruebbe's disciplinary history at the time he allegedly cared for his children at work does not appreciably differ from Moore's history. Moore's journal reflects that by the time she received the FCAN in August 2016, she had received three customer complaints for rudeness and a Written Corrective Action Notice for reliability. The Written Corrective Action Notice for reliability followed four occasions in which she was verbally coached for repeated absences and tardy arrivals to work. Each of these incidents occurred in 2016, except for one reliability coaching on December 5, 2015.

Kruebbe's journal reflects he was coached twice for failing to "[use] guest name[s] 100% of the time" and once for failing to observe a scheduling change. In addition, Kruebbe's journal shows he arrived to work tardy twice, and received a customer complaint for rudeness. Each incident occurred in 2014, except for one tardy arrival on January 1, 2015. Most critically, all of these incidents occurred during the same time frame Kruebbe disputedly cared for his children at work on several occasions.

Pursuant to the McDonnell-Douglas framework, Delta proffers the following legitimate justifications for Tiemann's FCAN. First, Moore received three customer complaints to Kruebbe's one, and arrived tardy on twice as many occasions.

Furthermore, the bulk of Moore's misconduct arose within four months of her August 12, 2016, FCAN, whereas Kruebbe's arose over the course of a year and not at all after January 1, 2015. *See Hartwell v. Spencer*, No. 18-14488, 2019 U.S. App. LEXIS 33820, at *16 (11th Cir. Nov. 13, 2019) (no comparator evidence where plaintiff's misconduct, while the same type as that of the alleged comparator, occurred more frequently and with a greater proximity to the adverse employment action). Finally, Moore had already received a Written Corrective Action Notice by the time Tiemann issued her the FCAN, while the severity of Kruebbe's discipline never exceeded a verbal coaching.

In rebuttal, Moore satisfies her burden of demonstrating that Delta's proffered justification for Moore's FCAN constitutes pretext. As previously recounted, Kruebbe's journal portrays that during the time frame he, like Moore, disputedly cared for his children at work, he received discipline for tardy arrivals and customer service-related issues. This evidence demonstrates that while Moore's and Kruebbe's misconduct arose at different times, it remained nonetheless comparable. Kruebbe's lack of discipline for such misconduct incites a reasonable inference that Tiemann issued Moore the FCAN as a pretext for racial discrimination.

In addition, evidence of pretext manifests in Tiemann's response, "it's different for you," when Moore queried the reasons Tiemann did not reprimand Kruebbe for having his children at work. A reasonable juror may conclude that Tiemann's remark denotes a differential treatment of Moore on the basis of her race.

Finally, although Kruebbe's children were present in the workplace on various occasions between 2011 and 2014, Tiemann did not discuss these occasions with Kruebbe until August 12, 2016 – the day Tiemann issued Moore the FCAN. Tiemann and Kruebbe's August 12th discussion engenders a reasonable inference Tiemann realized his differential treatment of Moore and spoke to Kruebbe to mitigate the appearance thereof. This evidence further supports a reasonable conclusion that Tiemann issued Moore the FCAN as a pretext for racial discrimination.

Therefore, the court **DENIES** Delta's Motion for Summary Judgment as to Moore's § 1981 race discrimination claim based upon the issuance of the FCAN.

### B. Moore Fails to Sustain a Genuine Dispute of Material Fact under *Quigg* and *McDonnell Douglas* that Delta Terminated Her Employment Based Upon Her Race

#### 1. *A Reasonable Jury Could Not Infer Moore's Race Constituted a Motivating Factor for her Termination.*

Moore alleges Delta impermissibly considered her race in terminating her employment. As previously discussed, to prevail under the *Quigg* mixed-motive framework, Moore must present sufficient evidence to permit a reasonable jury to conclude her termination constitutes an adverse employment action, and her race a motivating factor thereof. *Quigg*, 814 F.3d at 1239. Delta does not dispute Moore suffered an adverse action when it terminated her employment. Accordingly, the court will assess whether a reasonable jury could infer Delta considered Moore's race in terminating her.

Moore argues Tiemann's comment, "it's different for you," and his more favorable treatment of Kruebbe demonstrate that her race constituted a motivating factor for her termination. (Doc. 48 at 28). However, Tiemann only recommended Moore's termination. Therefore, as established previously, the cat's paw theory applies to Moore's termination because Tiemann was not the ultimate decisionmaker regarding Moore's discharge. *See Staub*, 562 U.S. at 422 (an employer could be liable only if the subordinate supervisor (1) performs an act motivated by discriminatory animus that is intended to cause an adverse employment action, and (2) that act is a proximate cause of the ultimate employment action).

For much of the same reasons lodged in the retaliation section, a reasonable juror cannot conclude Tiemann's alleged discriminatory motive is a proximate cause of Moore's discharge. As recounted previously, in *Staub* the Supreme Court described the circumstances in which an employer's independent investigation severs the cat's paw, proximate cause (motivating factor) link:

> If an employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable. But the supervisor's biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified.

*Staub*, 562 U.S. at 421.

As demonstrated previously, Delta's review concluded that Moore's discharge was "entirely justified" apart from Tiemann's recommendation. To recount, Tiemann

recommended Moore's termination in a memorandum to Franklin on November 10, 2016. Subsequently, the decision to discharge Moore underwent a progressive review in multiple departments before Delta terminated Moore's employment: Franklin accepted the recommendation first, then obtained Baldwin's approval thereof. Next, on behalf of ACS, Franklin submitted a recommendation to HR. On November 18, 2016, Morrison adopted ACS's recommendation and escalated it to HR General Manager Jessup. Jessup and another HR Managing Director, Lisa Blackmon, approved the recommendation for termination. On November 28, 2016, another Delta HR official, Nicole Elkins, notified Franklin and Tiemann that "the Company . . . decided to terminate Dreama Moore's employment." (Doc. 49-19 at 2). In addition, James Brimberry, Program Manager, Equal Opportunity, reported in a November 22, 2016, email to Morrison that he "had a chance to view the video and the file." (Doc. 47-6 at 54).

Most importantly, this multi-level review of the recommendation considered the seven customer complaints lodged against Moore in 2016, including the DP complaint. The evidence from disinterested witnesses – the customers themselves – demonstrates that Delta determined, independent of Tiemann's alleged bias, that the circumstances warranted the termination of Moore's employment. That is, Delta's review determined Moore's discharge was "entirely justified" apart from Tiemann's alleged bias. *See Staub*, 562 U.S. at 421.

Finally, the court discerns no additional evidence that would permit a reasonable jury to infer that Moore's race partly motivated Delta to terminate her employment, or even that a "convincing mosaic of circumstantial evidence" evinces discriminatory intent by Delta's decisionmakers in the cat's paw framework. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). Read in the light most favorable to Moore, Baldwin's emails regarding a putative discrimination claim and "the associated risk" do not reasonably convey that Delta considered Moore's race a *reason* to terminate her, even if they convey an awareness that Moore believed the same.[20] Accordingly, the record lacks sufficient evidence to permit a reasonable inference that Moore's race constituted a motivating factor for her termination.

### 2. Moore Cannot Establish a Prima facie Case of Discrimination Under the McDonnell Douglas *Framework.*

Likewise, the evidence remains insufficient under the *McDonnell Douglas* framework to submit Moore's discrimination claims to a jury. To satisfy her initial burden under *McDonnell Douglas*, Moore must identify a comparator with whom she is similarly situated in all material respects. *Lewis*, 918 F.3d at 1218. Moore fails to do so.

Moore argues Kruebbe represents a comparator for purposes of the termination. Moore's misconduct arising after the FCAN eliminates any reasonable inference that Moore and Kruebbe were similarly situated at the time of her termination. Between

---

[20] Moore's "own speculation or subjective belief of discrimination, however genuine, cannot preclude summary judgment or be a basis for judicial belief." *Thomas v. Nicholson*, 263 Fed. Appx. 814, 816–17 (11th Cir. 2008) (citing *Cordoba v. Dillard's Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005)).

the August 12, 2016, FCAN and her termination, Moore received four customer complaints, including the DP complaint. Moore argues Kruebbe received favorable treatment because he received a customer complaint for rudeness but was not terminated. But customers complaining of Moore's and Kruebbe's customer service for the same reason does not, in itself, indicate "substantive likenesses" between Moore and Kruebbe. *Lewis*, 918 F.3d at 1228. As previously noted, Kruebbe received one customer complaint in 2014. Moore, by contrast, received seven customer complaints in 2016,[21] four of which arose after she received the FCAN, the most serious disciplinary action shy of termination. Furthermore, Moore fails to identify,[22] and the record does not portray, the existence of another comparator. Accordingly, Moore cannot establish a *prima facie* case of discriminatory discharge under the *McDonnell Douglas* framework.

The court notes that even if Moore could establish a *prima facie* case of discrimination, she offers insufficient evidence to demonstrate pretext under the final step of the *McDonnell Douglas* framework due to the applicability of the afore-discussed cat's paw theory. Delta maintains its decisionmakers discharged Moore due to her handling of the DP incident, her record of prior customer complaints, and her reliability

---

[21] Delta's Motion states Moore "received six customer complaints" in 2016, followed by a bullet-point list of seven customer complaints. The court counts a total of seven customer complaints in 2016.

[22] In her Amended Complaint, Moore alleges "Neil Alton had a negative encounter with a passenger and was not terminated." (Am. Comp. ¶ 59). However, the record contains no evidence supporting this allegation.

issues. These justifications constitute legitimate, non-discriminatory reasons for her termination. Moore cannot establish that these justifications constitute pretext for racial discrimination. As reviewed previously, the record lacks evidence that the Delta decisionmakers involved in Moore's termination portrayed race-based attitudes toward her, or evidence that would otherwise reveal any "weaknesses, inconsistencies, and contradictions" in Delta's justifications. *Springer*, 509 F.3d at 1348. Accordingly, Moore's claims cannot survive the final pretext stage of the *McDonnell Douglas* framework.

Therefore, the court **GRANTS** Delta's Motion for Summary Judgment as to Moore's Title VII and § 1981 race discrimination claims based upon her termination and **DISMISSES WITH PREJUDICE** these claims.

## Conclusion

For the foregoing reasons, the court **GRANTS IN PART and DENIES IN PART** Delta's Motion for Summary Judgment. The court will permit Moore's § 1981 retaliation and discrimination claims based upon the issuance of the FCAN to proceed to trial. The remaining claims warrant dismissal.

**DONE** this 15th day of January, 2020.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE